IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
SOUTHERN DIVISION

| | | |
|---|---|---|
| BOKF, N.A., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 6:14-cv-03025-MDH |
| | ) | |
| BCP LAND COMPANY, LLC, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## ORDER

Before the Court are the parties' various motions for summary judgment (Docs. 258, 260, 262, 264) and motions to exclude expert testimony (Docs. 252, 254). Upon careful review of the issues raised and arguments provided, the Court hereby **DENIES** all motions for summary judgment and **DENIES** all motions to exclude expert testimony.

## I.  BACKGROUND

Plaintiff BOKF commenced the present action against Defendants BCP Land Company, LLC ("BCP Land"), Jack Redwine, and various companies hereinafter referred to as "Buyer Defendants" or "purchasing entities" in January of 2014 seeking a declaratory judgment regarding the interpretation of a trust indenture and bringing claims for unjust enrichment against Redwine and negligent misrepresentation against BCP Land. Defendant Redwine filed counterclaims against BOKF for breach of contract and money had and received.

In January of 2015, with leave of Court, Plaintiff filed an amended complaint that added new parties and claims. Plaintiff added the organizational and individual members of BCP Land as defendants, as well as Jack Kynion II ("Jack Kynion"), and two additional companies added to the group of "Buyer Defendants." The Amended Complaint asserted a new claim under the

Racketeer Influenced and Corrupt Organizations Act ("RICO") against all Defendants and changed Plaintiff's negligent misrepresentation claim to a fraudulent misrepresentation claim. Defendant Redwine filed amended counterclaims for declaratory judgment, breach of contract, and money had and received.[1]

Following the close of discovery, Plaintiff and BCP Land Defendants[2] filed motions for summary judgment and motions to exclude expert testimony, which all are now before the Court.[3] The Court held oral arguments on the motions on January 7, 2016 and allowed the parties to provide additional briefing. The motions are now fully briefed and ready for disposition.

## II. MOTIONS FOR SUMMARY JUDGMENT

Both Plaintiff and the BCP Land Defendants argue they are entitled to summary judgment on Plaintiff's declaratory judgment and unjust enrichment claims (Docs. 260, 264). The BCP Land Defendants further argue they are entitled to summary judgment on Plaintiff's RICO and fraudulent misrepresentation claims (Docs. 258, 260). Defendant Redwine argues he is entitled to summary judgment on his declaratory judgment counterclaim (Doc. 262). Plaintiff argues it is entitled to summary judgment on all of Redwine's counterclaims (Doc. 264).

---

[1] BCP Land and its members also asserted various counterclaims against Plaintiff and third parties but those counterclaims dismissed on or about May 15, 2015 (Doc. 189).

[2] Throughout the course of this litigation, BCP Land and its various members have been represented by the same attorneys and have filed most, if not all, of their pleadings and motions jointly. The Court refers to these Defendants collectively as the "BCP Land Defendants." The "BCP Land Defendants" include BCP Land Company, LLC, Jack Redwine, Timothy Jury, Phil Lopez, Jury Industries, LLC, and Zepol Industries, LLC.

[3] Neither Jack Kynion nor any of the Buyer Defendants filed any such motions. The Court notes that Jack Kynion and the Buyer Defendants which are directly associated with Kynion (i.e. Grace Properties Branson, LLC, SJ Legacy, LLC, Parkway Enterprises, LLC, and JH Branson, LLC) are currently unrepresented by counsel. Another Buyer Defendant, Business Advisors, LC, is currently represented by counsel but has taken no action before the Court other than filing an answer. The final Buyer Defendant, Appliance Center of the Ozarks, LLC, was served in this action but has never filed an answer or other responsive pleading.

## A. Standard

Summary judgment is proper where, viewing the evidence in the light most favorable to the non-moving party, there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Reich v. ConAgra, Inc.*, 987 F.2d 1357, 1359 (8th Cir. 1993). In other words, "[w]here there is no dispute of material fact and reasonable fact finders could not find in favor of the nonmoving party, summary judgment is appropriate." *Quinn v. St. Louis County*, 653 F.3d 745, 750 (8th Cir. 2011). Initially, the moving party bears the burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the movant meets the initial step, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). To satisfy this burden, the nonmoving party must "do more than simply show there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

## B. Undisputed Material Facts

### *Creation of the District*

The Community Improvement District ("District") is a political subdivision of the State of Missouri within the City of Branson, Missouri created on or about September 11, 2006 by Ordinance No. 2006-125, enacted by the City of Branson pursuant to the Missouri Community Improvement District Act. The District is comprised of approximately 345 acres of land in Branson, Missouri. At the time the District was created, all of the property in the District was owned by Branson Commerce Park, LLC and four related entities that intended to develop the property for commercial and residential purposes (the "Special Assessment Property"). To finance the development of the Special Assessment Property, on or about June 27, 2007, the

3

District authorized the issuance of $13,590,000 Branson Commerce Park Community Improvement District Special Assessment Bonds, Series 2007A, and $3,150,000 Branson Commerce Park Community Improvement District Subordinate Special Assessment Revenue Bonds, Series 2007B (collectively, "the Bonds"). In general, the District pays interest and principal due under the Bonds to the bondholders by imposing special assessments against the owners of the Special Assessment Property. The terms of the Bonds and the District's obligations to the bondholders are set forth in the Trust Indenture, which was entered into on or about July 1, 2007 between the District and the Trustee.[4]

### *The Development Period Reserve Fund ("DPRF") and the Replenishment Covenant*

Under Section 401(a) of the Trust Indenture, a Development Period Reserve Fund ("DPRF") was created and established with the Trustee. The DPRF was funded by the original "Developer" of the property, Branson Commerce Park, LLC, which deposited $1,424,768.75 with the Trustee. Under Section 406 of the Trust Indenture, the moneys in the DPRF are to be used by the Trustee to pay any defaulted special assessments on Special Assessment Property owned by the Developer ("Developer Owned Special Assessment Property"). In such an event, the Trustee will pay the DPRF funds to the County Collector and the County Collector will then pay those moneys into a separate fund to pay interest and principle to the bondholders. Section 406(c) of the Trust Indenture provides:

> The amount on deposit in the [DPRF] will be reduced on or after June 2 of each year if and to the extent that (a) the Developer provides the Trustee with documents evidencing that the Developer has transferred a portion of the Developer Owned Special Assessment Property to third parties not controlling, controlled by or under common control with the Developer, and (b) the District gives the Trustee written notice that all Special Assessments, penalties and/or interest on said parcel, if any, currently due and payable on such property have been paid through the date of the proposed reduction. Upon satisfaction of such

---

[4] Southwest Trust Company, N.A. was the original Trustee who entered into the Trust Indenture. Plaintiff BOKF, N.A. is a successor by merger to Southwest Trust Company, N.A. and is the current Trustee.

Case 6:14-cv-03025-MDH   Document 299   Filed 03/09/16   Page 4 of 27

requirements, the Trustee shall release to the Developer a pro-rata amount of the [DPRF]. That amount shall be determined by dividing the square footage of the Developer Owned Special Assessment Property transferred by the Developer by the aggregate square footage of the Developer Owned Special Assessment Property immediately prior to such transfer and multiplying the resulting ratio by the amount then on deposit in the [DPRF].

Trust Indenture, Am. Compl., Ex. 1, at p. 26. The Trust Indenture defines "Developer" as "Branson Commerce Park, L.L.C., and affiliates or successors thereof." *Id.* at p. 4.

In connection with the Trust Indenture, Branson Commerce Park, LLC, as the original Developer, also entered into a Replenishment Covenant. Under the terms of the Replenishment Covenant, Branson Commerce Park, LLC agreed that "in the event [the Trustee] . . . is required to withdraw funds from the [DPRF] to pay Special Assessments . . . on any or all Developer Owned Special Assessment Property, [the Developer] will, within twenty (20) days after written notice from the Trustee, replenish the [DPRF] in an amount equal to 110% of the withdrawal amount[.]" The Replenishment Covenant states it is binding on Branson Commerce Park, LLC and its successors and assigns. Under the terms of the Replenishment Covenant, certain individuals (collectively "Guarantors"), one of whom is Jack Redwine, agreed to "unconditionally, jointly and severally, and irrevocably guarantee" the replenishment obligations of Branson Commerce Park, LLC and its successors and assigns. The Guarantors' liability under the Replenishment Covenant continues until there ceases to be any Developer Owned Special Assessment Property and all Special Assessments with respect to that property have been paid.

### Sale to BCP Land and Prior Litigation

On May 12, 2009, BCP Land was formed as a Missouri limited liability company. BCP Land has three members, each of whom holds own a one-third membership interest in the company: (1) Jack Redwine, Trustee of the Jack J. Redwine Trust; (2) Jury Industries, LLC; and (3) Zepol Industries, LLC. Jury Industries, LLC is a Kansas limited liability company with

5

Timothy Jury as Trustee U/T/A of Timothy G. Jury as the sole member. Zepol Industries, LLC is a Kansas limited liability company with Phil Lopez and his wife, Kimberley Lopez, as the sole members. On May 13, 2009, Branson Commerce Park, LLC – which had a membership consisting of Jack Redwine, Jury Industries, LLC, and Zepol Industries, LLC, and one other individual – sold all of its right, title, and interest in the Developer Owned Special Assessment Property to BCP Land and assigned all of its right, title, and interest with respect to the DPRF funds, including the right to receive all distributions of the proceeds from the DPRF under Section 406 of the Trust Indenture, to Redwine. On May 28, 2009, Branson Commerce Park, LLC notified the Trustee of the sale and assignment and further notified the Trustee that all currently due and owing special assessments had been paid in full. On July 7, 2009, Redwine demanded that the Trustee terminate the DPRF and release the funds in the DPRF to Redwine. On August 21, 2009, the Trustee rejected Redwine's demand to release the funds.

Redwine subsequently initiated suit against the Trustee in the Western District of Missouri claiming all conditions for release of the DPRF had been satisfied under Section 406(c) and the Trustee should be required to release the funds. On September 30, 2011, United States Magistrate Judge Sarah W. Hays granted summary judgment in favor of the Trustee and held that Redwine was not entitled to disbursement of the funds in the DPRF as of the date of the sale of the property in May of 2009. Judge Hays held that BCP Land was a "successor" to Branson Commerce Park, LLC under the terms of the Trust Indenture and "[b]ecause the property was sold to a successor of the developer, the requirements of Sections 406(c) and (e) of the Trust Indenture were not satisfied." In interpreting the Trust Indenture, Judge Hays defined "successor" as "one who takes the place of another" and explained that:

> Reading the Trust Indenture as a whole, it is clear that the DPRF was set up to protect the District in case the Developer failed to make the required special

6

assessment payments on the property. . . . If this Court were to adopt Redwine's interpretation of the meaning of the Trust Indenture, the protection afforded the District by Section 406 of the Trust Indenture would be illusory. Under Redwine's interpretation, the developer could simply sell all of the property to a new company and, as long as the special assessments were current at the time of this sale, claim any funds remaining in the DPRF. At this point the DPRF would be at an end along with the requirement for the developer and the guarantors to replenish the DPRF.

Order, Pl's Mot. Summ J., Ex. 4. Redwine did not appeal.

### 2012 and 2013 Sales and Disbursement of DPRF Funds to Redwine

In 2012, following an auction at which various parcels of BCP Land's property were offered for sale, BCP Land sold and transferred certain parcels of Developer Owned Special Assessment Property to certain purchasing entities. BCP Land sold Lots 9C-12C and Lot 40MF to Grace Properties Branson, LLC for $2,200 and $1,100, respectively. BCP Land sold Lots 30C-35C and Lots 36MF-37MF to SJ Legacy, LLC for $3,300 and $2,200, respectively.[5] BCP Land sold Lots 13C-19C to Parkway Enterprises, LLC for $3,850. Finally, BCP Land sold Lots 27C-29C to JH Branson, LLC for $452,000, with a $2,000 down payment and the remainder of the purchase price financed by BCP Land with the buyer's agreement "to use future net proceeds from the sale of the Property to satisfy the Note." The purchase agreement between BCP Land and JH Branson, LLC further specified that:

> Should the total of net proceeds exceed the value of the Note, Buyer agrees to pay a percentage of the excess to Seller. The specific percentage and amount shall be determined by mutual agreement of Buyer and Seller. Should the total of net proceeds be less than the value of the Note, Seller agrees to accept the lesser amount as full satisfaction of the Note. These provisions shall remain in effect for a period of two years from the Effective Date of this Agreement unless extended by mutual agreement of Buyer and Seller.

---

[5] Lots 30C-35C were originally sold to Country Meadows Estates, LLC and then Country Meadow Estates, LLC assigned its rights in Lots 30C-35C to SJ Legacy, LLC. Jack Kynion is the principal member of Country Meadow Estates, LLC. After the assignment, BCP Land transferred both lots 30C-35C and 36M-37M to SJ Legacy, LLC.

7

*See* Am. Compl., Ex. 17, at ¶ 4.  To date, JH Branson, LLC has not sold the property and has made no further payments to BCP Land to repay the portion of the purchase price financed by BCP Land.  Following each of the sales outlined above, Lopez requested that the Trustee release a pro rate portion of the DPRF to Redwine.  The Trustee complied and incrementally released a sum of $962,646.61 from the DPRF to Redwine in 2012.  Since the 2012 sales took place, none of the purchasing entities have paid any of the special assessments that have become due and owing on their properties.

In 2013, following another auction at which various parcels of BCP Land's property were offered for sale, BCP Land sold and transferred two additional parcels of Developer Owned Special Assessment Property.  Specifically, BCP Land sold Lot 39MF to Business Advisors, LC for $220 and sold Lot 39MF to Appliance Center of the Ozarks, LLC for $330.  At the time of those sales and transfers, all Special Assessments due and owing on the properties were paid in full.  Following the sales, Lopez again requested that the Trustee release a pro rata portion of the DPRF to Redwine.  This time, the Trustee refused.  Since the 2013 sales took place, the 2013 purchasing entities have not paid any of the special assessments that have become due and owing on their properties.  With regard to the unpaid special assessments, one of the owners of Business Advisors, LC, stated during his deposition that "[w]e always knew that we would not be paying them . . . [b]ecause we had no intention of ever paying them."  *See* Pl.'s Mot. Summ. J., Ex. 8, at 74.

The following chart outlines the e-mails sent from Lopez to the Trustee requesting the release of DPRF funds to Redwine.  At the time Lopez sent the e-mails, Lopez served as both the Managing Member of BCP Land and as the Executive Director, Treasurer, and Secretary of the District.  The chart further reflects the Trustee's releases of the DPRF funds.

| Lots | E-mail | Release |
|---|---|---|
| 9C-12C | August 24, 2012:<br>"Some great news.  BCP Land Company has closed on 4 Commercial Lots today as a result of the Auction Sales.  These lots are 9C, 10C, 11C & 12C.  I have attached the Spread Sheet that you and I have been using to identify which lots sold and their corresponding Public Improvement Assessment amount which then needs to be released from the Developers Reserve Fund.  In addition, her [sic] are the wiring instructions to send the funds to Mr. Jack Redwine: [bank account information omitted].  If you have any questions, please feel free to give me a call.  If you would, please let me know when the funds will be transferred to Mr. Redwine." | $170,794.65 released August 24, 2012 |
| 30C-35C | September 13, 2012:<br>"We have been informed that 6 Commercial Lots were sold and closed yesterday at Branson Commerce Park.  They are Lots 30C thru 35C.  I have attached our ongoing spreadsheet which shows which lots and their respective Special Assessment values.  I have also color coded the Lots to show which ones the Developers Reserve Fund has already been released and which ones are now due to be released.  If you have any questions please feel free to contact me." | $239,517.00 released September 14, 2012 |
| 13C-19C | November 12, 2012:<br>"Per my last email of 10/15 the folks at BCP Land Co did sell lots 13C thru 19C at Branson Commerce Park.  Attached is our working spreadsheet showing which lots have been sold.  As always any monies to be wired should be sent to Mr. Jack Redwine's account.  Please let me know when the wire has been completed." | $303,772.80 released November 13, 2012 |
| 27C-29C | December 4, 2012:<br>"Attached is the Spreadsheet showing another group of Lots at Branson Commerce Park that were sold last month. Lots 27C, 28C, & 29C.  Please feel free to send the appropriate Special Assessment amounts to Mr Jack Redwine.  Let me know when the funds has been sent, so I can notify Mr. Redwine." | $67,678.35 released December 4, 2012 |
| 36MF-37MF and 40MF | December 27, 2012:<br>"Attached is the Spreadsheet showing another group of Lots at Branson Commerce Park that were just sold. Lots 36MF 37MF & 40 MF.  Please feel free to send the appropriate Special Assessment amounts to Mr Jack Redwine.  Please let me know when the funds have been sent, so I can notify Mr. Redwine." | $180,883.81 released December 27, 2012 |
| 38-39MF | January 6, 2014:<br>"We have learned that in addition to Lot 167r that sold this past October Lots 38MF and 39MF have also sold at Branson Commerce Park in 2013.  I have attached all the information with regards to each sale as well as the working spreadsheet showing the Special Assessment amounts for each lot.  Please review and send the appropriate amounts to Mr. Jack Redwine from the Developers Reserve fund." | (refused to release) |

### Relationship Between BCP Land and Buyer Defendants

The sole and/or principal owner of all four of the 2012 purchasing entities was and is Jack Kynion.  Three of those four entities – Grace Properties, LLC, Parkway Enterprises, LLC,

9

and JH Branson, LLC – were formed in 2012, conducted no business prior to that, and the only business they have engaged in since then is purchasing the Special Assessment Property and activities related to the ownership of that property.

Kynion also served as the financial planner or financial advisor for Redwine and Jury for approximately the past fifteen years. Between 2010 and 2015, Kynion derived on average 5.4% of his total annual income from managing the assets of Redwine and 4.1% of his total annual income from managing the assets of Jury. Kynion has provided advice to Redwine regarding Redwine's investment in the Branson Commerce Park project since approximately 2009 and Kynion was previously designated by Redwine as a non-testifying expert in the prior litigation. In April of 2010, prior to the decision issued by Judge Hays, Kynion sent a letter to both Redwine and Jury outlining his thoughts and advice concerning the release of the DPRF funds and Redwine's exposure under the Replenishment Covenant. In that letter, Kynion questioned whether the Trustee would be required to release DPRF funds in various scenarios, including scenarios where the land was sold to companies partially owned by BCP Land members, where the land was sold and members of BCP Land maintained a right to share in profits, and where Kynion purchased the land. In the letter, Kynion also inquired about potential consequences if the property owners refused to pay special assessments in order to put pressure on the bondholders. On April 22, 2010, the attorney representing BCP Land and the District responded to Kynion's questions in a memo sent to Redwine, Jury, Lopez, and Kynion, and stated that "I think that [Trustee] would not release the DPRF if it knew, or finds out, that Jack is connected with TP&J."

E-mails dating back to 2011 indicate Kynion has been involved in various efforts to market and sell the lots owned by BCP Land. In September of 2011, Kynion sent an e-mail to

10

Redwine discussing his call to check-in with a commercial realtor retained by BCP Land to sell the property. In October of 2011, Jury forwarded a proposal from an auctioneer retained by BCP Land to Kynion and asked Kynion to "give us your thoughts." Around April of 2012, Kynion was involved in the negotiation of a sale of property on BCP Land's behalf and Jury noted in an e-mail to Redwine, Lopez, and Kynion that "Mr. Kynion gets all the credit for coming up with this idea and working with McSpadden on it" and "we need to leave room in the pricing for his compensation." In July of 2012, Redwine sent an e-mail to Walter Koschnitzke, a person engaged by BCP Land to assist with marketing efforts, which referred to Kynion as a member of "The Team" and described Kynion as the "[f]inancial planner and counselor helping the three of us navigate the [Branson] Commerce Park financial challenges." At some point, Kynion also had a conversation with Rush Harding, a representative of the boldholders, where stated he might be able to offer, on behalf of BCP Land Company, LLC, a purchase of the bonds for 65 cents on the dollar.

On April 18, 2012, Jury sent an e-mail to Redwine and Lopez that stated he spoke to counsel regarding the upcoming auction and the fact that "Kynion might be putting together an independent ownership group to bid on the Commercial and MFR lots that we plan to sell regardless of price" and "given that this group might acquire some lots at a very low price, they might decide not pay future property taxes and assessments when due." In that e-mail, Jury stated the attorney "saw no issue with this as long as Jack's group is completely independent of the three of us" and "advised that we should have no involvement with this venture and it's [sic] activities going forward." In June of 2012, Kynion ordered his attorney to place bids on certain parcels of BCP Land using the name Grace Properties Branson, LLC and instructed his attorney that he wanted to ensure his name never showed up on any of the bid documents. In July of

2012, Jury re-circulated the 2010 memo and stated it was "worth reading in its entirety again." On August 5, 2012, Jury sent a timeline to Lopez, Kynion, and Redwine detailing target dates for closing on BCP Land's ten auction lots, receiving offers on and closing the other thirteen lots, and requesting release of the DPRF from the Trustee.

The two 2013 purchasing entities were Business Advisors, LC and Appliance Center of the Ozarks, LLC. Business Advisors, LC has two members: John Gilliford and Keith Hanson. Gilliford is an attorney who Kynion engaged as legal counsel prior to 2012 to provide general business and corporate counsel work. Gilliford was the attorney who assisted Kynion with organizing Grace Properties Branson, LLC and with preparing bid forms for the properties purchased by Grace Properties Branson, LLC. Hanson is a financial planner who shares office space with Kynion and who has provided joint financial services with Kynion in the past. Hanson considers Kynion a personal friend and mentor and he stated he heard about the auction when Kynion asked if he would be interested in buying a lot in that auction. Appliance Center of the Ozarks, LLC, has two members: Charles Engram and Mary Engram. Charles Engram was retained by BCP Land in the fall of 2013 as a consultant to "create energy and excitement" about Branson Commerce Park and to sell lots owned by BCP Land. Engram holds himself out to the public as "Sr. Director of Business Development" of Branson Commerce Park and Redwine, Jury, and/or Lopez approved of Engram using that title. BCP Land pays Engram's LLC $1,000 per month for Engram's services plus a commission for sales that he generates.

### C.  Analysis

The Court finds there are genuine issues of material fact that preclude summary judgment, as described below.

### 1. Declaratory Judgment and Unjust Enrichment Claims

Plaintiff's declaratory judgment and unjust enrichment claims and Defendant Redwine's declaratory judgment, breach of contract, and money had and received counterclaims all turn on whether the purchasing entities are "controlling, controlled by, or under common control" with BCP Land and/or whether the purchasing entities are "successors" or "affiliates" of BCP Land such that the release (or non-release) of the DPRF funds to Redwine was proper under Section 406(c) of the Trust Indenture.[6]

It is well established that the "cardinal principle for contract interpretation is to ascertain the intention of the parties and to give effect to that intent." *Butler v. Mitchell-Hugeback, Inc.*, 895 S.W.2d 15, 21 (Mo. 1995). To determine the intent of the parties, the court should "use the plain, ordinary and usual meaning of the contract's words and consider the document as a whole." *SD Investments, Inc. v. Michael-Paul, L.L.C.*, 90 S.W.3d 75, 81 (Mo. Ct. App. 2002). The court should glean the intent of the parties from the contract alone unless the contract is ambiguous. *Ethridge v. TierOne Bank*, 226 S.W.3d 127, 131 (Mo. 2007). A contract is ambiguous when "its terms are susceptible to fair and honest differences." *Dunn Indus. Group, Inc. v. City of Sugar Creek*, 112 S.W.3d 421, 428 (Mo. 2003). Such is the case "when there is duplicity, indistinctness, or uncertainty in the meaning of the language in the policy." *Gulf Ins. Co. v. Noble Broadcast*, 936 S.W.2d 810, 814 (Mo. 1997). A contract is not ambiguous simply because the parties disagree as to the meaning of the terms. *State ex rel. Vincent v. Schneider*, 194 S.W.3d 853, 860 (Mo. 2006). "The dictionary is a good source for finding the plain and ordinary meaning of contract language; but the contract's context must be considered in applying

---

[6] Plaintiff also argues that subsection (b) of Section 406(c) of the Trust Indenture was not satisfied with respect to the 2013 purchases and that "Defendants are unable to satisfy another separate condition" to justify the release of the DPRF funds to Redwine. The Court does not address that issue at this time because it was neither pleaded in the Amended Complaint nor is it necessary to decide in denying the parties' motions for summary judgment.

13

the appropriate dictionary definition."  *Schler v. Coves N. Homes Ass'n*, 426 S.W.3d 720, 723 (Mo. Ct. App. 2014).

Here, Plaintiff argues the purchasing entities were "affiliates" of BCP Land and/or "controlling, controlled by or under common control" with BCP Land.[7]  The parties agree that the terms "affiliate" and "control" are not defined in the Trust Indenture and that the Court should look to the common and ordinary meaning of those words.   Both parties cite various dictionary definitions, albeit different ones, to suggest the common and ordinary meaning of the terms.   In general, Plaintiff argues broader definitions are more appropriate based on the spirit and purpose of the DPRF and the Trust Indenture as a whole, whereas the BCP Land Defendants argue narrower definitions are more appropriate based on the highly specialized nature of the Trust Indenture, the sophistication of the parties, and the intent of the drafters.   After reviewing the various definitions and resources cited by the parties and after considering the parties' arguments regarding the purpose of the DPRF, the nature and scope of the Trust Indenture, and the relationship of the parties, the Court finds the following definitions most accurately reflect the meaning of the words as used in the Trust Indenture.

With regard to the term "affiliate" the Court finds the intended meaning of that term as used in the Trust Indenture is the meaning ascribed in Black's Law Dictionary – "A corporation that is related to another corporation by shareholdings or other means of control; a subsidiary,

---

[7] The BCP Land Defendants argue Plaintiff "waived" any argument that the buyers qualify as "control entities" of BCP Land by not specifically raising an argument regarding the "controlled, controlled by or under common control with the Developer" language in response to Defendants' motion for summary judgment.   The Court rejects Defendants' argument.  Plaintiff acknowledged at oral argument and in its supplemental brief that Plaintiff's initial briefing analyzed the buyers' connections to BCP Land using definitions of the term "affiliate"; however, both parties agree that an analysis of the term "affiliate" necessarily involves an analysis of degree of control.  The BCP Land Defendants actually state in their supplemental briefing that "the 'affiliate' analysis is virtually the same as the 'control' analysis" and that, under Defendants' suggested definitions, "an affiliate is an entity that controls, is controlled by, or is under common control with, some other entity" such that the questions "are, effectively, one and the same."  The Court allowed supplemental briefing on the issues discussed at oral argument and Defendants were in no way prejudiced because all parties were permitted to submit supplemental and responsive supplemental briefs.

parent, or sibling corporation." BLACK'S LAW DICTIONARY 63 (8th ed. 2004). As an initial matter, the Court notes the Trust Indenture uses the word "affiliate" as a noun – i.e. "Branson Commerce Park, L.L.C., and affiliates or successors thereof" – and, therefore, a noun definition is the most appropriate under the circumstances. Although Plaintiff argues the plain and ordinary meaning of the term "affiliate" essentially means a member of a team, the Court is more persuaded by Defendants' argument that the term "affiliate" requires more than simple association, relationship, or connection, and necessarily involves an element of control. Such an interpretation is more consistent with noun definitions provided for the term "affiliate"[8] and is more consistent with the purposes of the DPRF and Trust Indenture as a whole.[9] Based on the nature of the contract involved here – a heavily negotiated Trust Indenture involving sophisticated parties – and the purposes and circumstances of the contract, the Court finds the legal definition of "affiliate" as provided in Black's Law Dictionary is the most appropriate definition under the circumstances. *See generally Schler*, 426 S.W.3d at 723 ("the contract's context must be considered in applying the appropriate dictionary definition").

---

[8] For example, the American Heritage Dictionary defines "affiliate" as "[a] person, organization, or establishment associated with another as a subordinate, subsidiary, or member: *network affiliates.*" *Affiliate Definition*, AHDICTIONARY.COM, https://ahdictionary.com/word/search.html?q=affiliate (last visited March 9, 2016). The Merriam-Webster's Dictionary defines "affiliate" as "an organization (such as a television station) that is a member of a larger organization (such as a national network)." *Affiliate Definition*, MERRIAM-WEBSTER.COM, http://www.merriam-webster.com/dictionary/affiliate (last visited March 9, 2016). The Dictionary.Com definition – which is based on Random House Dictionary definition – for "affiliate" is "a branch organization" or "a business concern owned or controlled in whole or in part by another concern" or "a subsidiary" or "a person who is affiliated; associate; auxiliary." *Affiliate Definition*, DICTIONARY.COM, http://www.dictionary.com/browse/affiliate?s=t (last visited March 9, 2016). The Business Dictionary states that "[t]wo parties are affiliates if either party has the power to control the other, or a third party controls or has the power to control both." *Affiliate Definition*, BUSINESSDICTIONARY.COM, http://www.businessdictionary.com/definition/affiliate.html (last visited March 9, 2016).

[9] While the DPRF was established to provide security to the bondholders in the event the Developer failed to pay special assessments, the DPRF was never intended to continue in perpetuity and the goal under the Trust Indenture was always to develop the property, sell the property, and pass the special assessments along to third party buyers. To hold that DPRF funds cannot be released back to the Developer (in this case Redwine, due to the assignment) simply because a third party buyer has some sort of relationship or association with the Developer (or its members) without any element of control between the two clearly goes beyond the purpose of the DPRF and is surely not what was contemplated by the parties.

15

With regard to the term "control" as used in the definition of "affiliate" and as used in the "controlling, controlled by or under common control" language in the Trust Indenture, the Court finds the appropriate definition again comes from Black's Law Dictionary. Black's Law Dictionary defines "control" as "[t]he direct or indirect power to govern the management and policies of a person or entity, whether through ownership of voting securities, by contract, or otherwise; the power or authority to direct, manage, or oversee." BLACK'S LAW DICTIONARY 353 (8th ed. 2004). This legal definition is consistent with the nature and context of the Trust Indenture and the parties agree that Black's Law Dictionary provides the appropriate definition. *See* Pl.'s Supp. Sugg. at 13; BCP Land Defs' Supp. Sugg. at 6. Moreover, when the term "control" is used as a verb, as opposed to a noun, Black's Law Dictionary defines control as "[t]o exercise power or influence over" and "to regulate or govern." BLACK'S LAW DICTIONARY 353 (8th ed. 2004). That broader definition of control is relevant to the "controlling, controlled by, and under common control" language.

Despite citing to the above definition for control, the BCP Land Defendants stated at oral argument that "the question is really whether there's actual legal enforceable control" and in a footnote of supplemental briefing argued "'[i]ndirect' control does not mean, as BOKF seems to argue, the potential to influence, without any facts supporting the conclusion that this potential to influence was coupled with the legal ability to compel some conduct.'" Hrg. Tr. 91; Defs.' Resp. Pl.'s Supp. Sugg. at 7 n.6. Defendants' arguments attempting to narrow the definition of "control" and/or diverge from the definitions cited above are unpersuasive. The BCP Land Defendants cite no legal authority[10] for such a limited interpretation of the above definition and

---

[10] The BCP Land Defendants attached to their supplemental suggestions a declaration by Douglas Stone, an attorney who drafted and revised the bond documents at issue here, wherein Mr. Stone explains that he changed the prior language in Section 406(c) from "affiliated with" to "controlling, controlled by or under common control with" in order to (1) specify the meaning of affiliate, and (2) to narrow the concept of affiliation to reflect the common

the Trust Indenture makes no mention of "corporate" or "actual legal enforceable" control. *See*

*generally The Renco Grp., Inc. v. Certain Underwriters at Lloyd's, London*, 362 S.W.3d 472,

479 (Mo. Ct. App. 2012) ("Respondents' interpretation adds limiting language into the policy

provision that is not there, materially altering it. An interpretation that inserts language into a

contract is forbidden.").

Applying the above definitions for "affiliate" and "control" to the facts presented in this

case, the Court finds there are genuine issues of material fact regarding whether the 2012

purchasers qualify as "affiliates" of BCP Land or are considered "controlling, controlled by or

under common control" with BCP Land or its affiliates. The BCP Land Defendants argue

Plaintiff has presented facts that merely indicate Kynion was an advisor, expert, consultant,

representative, and agent of BCP Land but Plaintiff has failed to present any facts that show the

2012 purchasing entities were "affiliates" of BCP Land or in a "control" relationship with BCP

Land. The BCP Land Defendants point out that there is no overlapping ownership between BCP

Land and the 2012 purchasing entities and there are no agreements, written or otherwise, that

give BCP Land the power or authority to direct the policy or management of the 2012 purchasing

entities, or vice versa. The Court disagrees with Defendants' analysis and finds a jury could find

BCP Land and/or Kynion's entities had indirect power to govern the management, policies, and

actions of the other or had the power or authority to direct, manage, or oversee the other. While

Defendants correctly state that there is no evidence of direct power through common ownership,

---

corporate concept of affiliate, which involves actual control over an entity. Defs' Supp. Sugg., Ex. 1, at ¶¶ 6-7. As an initial matter, the Court notes there is no evidence in the record indicating the Trustee or Bond Counsel knew Mr. Stone's subjective intentions in making the modifications cited above or that the bondholders were aware of such revisions. Moreover, the Court finds it inappropriate to consider Mr. Stones' declaration because the term "control" is not ambiguous as used in the Trust Indenture. *Dunn Indus. Grp., Inc. v. City of Sugar Creek*, 112 S.W.3d 421, 429 (Mo. 2003) ("Extrinsic evidence may not be introduced to vary or contradict the terms of an unambiguous agreement or to create an ambiguity."). Furthermore, courts are to give a term its ordinary and plain meaning "unless it plainly appears that a technical meaning was intended." *Farmland Indus., Inc. v. Republic Ins. Co*., 941 S.W.2d 505, 508 (Mo. 1997).

ownership of voting securities, or an express written contract, the definition of control is not so limited; rather, the definition states the power may be "indirect" and may come from something other than ownership or a contract. Upon review, viewing the evidence in the light most favorable to Plaintiff, the Court finds Plaintiff has presented sufficient circumstantial evidence regarding the ties and relationship between the 2012 purchasing entities and BCP Land to create a jury question regarding whether such "control" existed.[11]

Defendant Redwine makes similar arguments as to the 2013 purchasing entities. As to Appliance Center of the Ozarks, LLC, the undisputed facts show the owner of that entity, Engram, was employed as a sales consultant for BCP Land in the fall of 2013 and BCP Land paid Engram's LLC $1,000 per month for Engram's services plus a commission for sales that he generated. Engram held himself out as the "Sr. Director of Business Development" of Branson Commerce Park. At or around that same time, Engram, acting on behalf of Appliance Center of the Ozarks, LLC, purchased Lot 38MF from BCP Land. As to Business Advisors, LC, the undisputed facts show the two owners of that entity – Hanson and Gilliford – had a prior relationship with Kynion. Gilliford served as Kynion's legal counsel and helped Kynion create and prepare the bid forms for Grace Properties Branson, LLC when it purchased land from BCP Land and was directed by Kynion to ensure Kynion's name never showed up on any of the bid documents. Hanson had a close personal and business relationship with Kynion and learned of the auction where Business Advisors, LC purchased land from BCP Land through Kynion. With

---

[11] *See generally* Mo. Rev. Stat. § 527.090 ("When a proceeding under sections 527.010 to 527.130 involves the determination of an issue of fact, such issue may be tried and determined in the same manner as issues of fact are tried and determined in other civil actions in the court in which the proceeding is pending."); *see, e.g., Turnbull v. Car Wash Specialties, LLC*, 272 S.W.3d 871, 874 (Mo. Ct. App. 2008) ("[I]n order to determine the rights of the parties under the Lease, the court must determine whether there was an implied easement to the Tract, and if so, whether such easement may be terminated. Both determinations require specific factual findings. Pursuant to section 527.090, Car Wash Specialties is entitled to have such factual questions submitted to the jury for its determination. After the jury has made the necessary findings of fact, the trial court can properly determine the rights of the parties under the Lease, and enter declaratory judgment accordingly.")

Case 6:14-cv-03025-MDH   Document 299   Filed 03/09/16   Page 18 of 27

regard to the unpaid special assessments, Gilliford admitted at his deposition that "we had no intention of ever paying them." Again, based on the circumstantial evidence and viewing the evidence before the Court in the light most favorable to Plaintiff, the Court finds there is sufficient evidence to create a jury question regarding whether the necessary "control" relationship – i.e. "[t]he direct or indirect power to govern the management and policies of a person or entity" or "the power or authority to direct, manage, or oversee" – existed in this case between the 2013 purchasing entities and BCP Land or BCP Land's successors or affiliates.

### 2. RICO and Fraudulent Misrepresentation Claims

The BCP Land Defendants argue they are entitled to judgment as a matter of law on Plaintiff's RICO and fraudulent misrepresentation claims because: (1) those claims are barred by the economic loss doctrine, (2) the alleged conduct does not amount to "racketeering activity" under RICO, and (3) the alleged false representations were not false or representations of fact. The Court finds each of these arguments is unavailing.

First, the BCP Land Defendants argue they are entitled to judgment on Plaintiff's RICO and fraudulent misrepresentation claims because those claims are barred by the economic loss doctrine. Defendants argue the claims are barred because they "stem solely from a determination of whether BCP Land's sales of property in 2012 and 2013 satisfied the requirements of Section 406(c) of the Trust Indenture" and "BOKF's actual damages for fraud are the same damages it seeks in its declaratory judgment and unjust enrichment claims." Plaintiff argues in response that there is no authority for application of the common law economic loss doctrine to RICO claims, that Missouri courts allow liability in tort to co-exist with liability in contract, that the economic loss doctrine is inapplicable because the losses at issue do not result from a breach of

contractual duty owned by BCP Land Defendants, and that Plaintiff's fraud-based claims seek

damages beyond what is provided in their declaratory judgment and unjust enrichment claims.

The economic loss doctrine generally prohibits a plaintiff from seeking to recover in tort

for economic losses that are contractual in nature. *Autry Morlan Chevrolet Cadillac, Inc. v. RJF

Agencies, Inc.*, 332 S.W.3d 184, 192 (Mo. Ct. App. 2010). "The doctrine was judicially created

to protect the integrity of the U.C.C. bargaining process; it prevents tort law from altering the

allocation of costs and risks negotiated by the parties." *Marvin Lumber & Cedar Co. v. PPG

Indus., Inc.*, 223 F.3d 873, 882 (8th Cir. 2000). In Missouri, "the economic loss doctrine grew

out of claims of tort which were alleged against builders of homes, or instances where a plaintiff

sought to hold a manufacturer or distributor of a product liable in tort[.]" *Autry Morlan

Chevrolet Cadillac*, 332 S.W.3d at 194. Missouri courts have recognized exceptions to the

economic loss doctrine in cases involving a fiduciary relationship, negligence in providing

professional services, the breach of a public duty, and in some cases involving real property

rights. *See generally Trademark Med., LLC v. Birchwood Labs., Inc.*, 22 F. Supp. 3d 998, 1002

(E.D. Mo. 2014); *Bruce Martin Const., Inc. v. CTB, Inc.*, No. 1:10CV205 SNLJ, 2012 WL

718624, at *3 (E.D. Mo. Mar. 6, 2012) *aff'd*, 735 F.3d 750 (8th Cir. 2013).

Upon review, the Court cannot say as a matter of law that Plaintiff's claims are barred by

the economic loss doctrine. As noted by Plaintiff, this suit involves a declaratory judgment

action rather than a breach of contract action and Plaintiff asks the Court to interpret the terms of

the Trust Indenture to which Defendants are a direct party.[12]   Defendant cites no case law

indicating the economic loss doctrine applies in such an instance. *See contra. Jo Ann Howard &*

---

[12] The Developer made no binding promises in the Trust Indenture nor did the Developer sign the Trust Indenture. Although Section 406(c) mentions the Developer in the context of the DPRF, that section generally discusses when the Trustee is obligated to release DPRF funds. Unlike the Replenishment Covenant, Section 406(c) and the Trust Indenture document itself contain no explicit covenants by the Developer.

*Associates, P.C. v. Cassity*, No. 4:09CV01252 ERW, 2014 WL 7408884, at *9 (E.D. Mo. Dec. 31, 2014) ("The economic loss doctrine does not apply here because the consumers and funeral homes were not in contract with Comerica and could not have brought breaches of contract claims."). Even assuming the economic loss doctrine does apply in the above scenario, Defendants have not established the doctrine applies in the trust/bond securities context as opposed to the commercial and real estate context.[13] Furthermore, Plaintiff seeks attorney fees and trustee fees that are not otherwise recoverable in declaratory judgment and unjust enrichment claims. *See Trademark Med.*, 22 F. Supp. 3d at 1003 (noting one "key" factor to consider in determining whether fraud claim is independent of contract claim is whether plaintiff suffered additional damages outside the contract as a result of the alleged fraud).[14]

Second, the BCP Land Defendants argue that "[e]ven if the Court were to find that the economic loss doctrine does not apply to Plaintiff's RICO claim, the Court should nevertheless grant summary judgment in BCP Land Defendants' favor because the alleged conduct of BCP Land Defendants does not amount to 'racketeering activity' under RICO." Defendants argue the type of conduct at issue in this case does not qualify as "racketeering activity" as a matter of law because "Plaintiff's RICO claim amounts to nothing more than an allegation that on multiple occasions over a two year period, the BCP Land Defendants failed to satisfy Section 406(c)'s

---

[13] The Court's independent research revealed one Missouri case involving an indenture trustee/bond issuer relationship. *Higher Educ. Loan Auth. of the State of Missouri v. Wells Fargo Bank, N.A.*, No. 4:10CV01230 AGF, 2011 WL 6010683 (E.D. Mo. Dec. 2, 2011). In that case, the court held the plaintiff's tort claims were not barred by the economic loss doctrine as a matter of law based on the professional services exception. *Id.* at *6-8. While that case is clearly distinguishable because the defendant there was the trustee under the trust indenture, the Court finds it is informative in the context at issue here.

[14] Attorney fees are only recoverable if authorized by statute or contract. *Lucas Stucco & EIFS Design, LLC v. Landau*, 324 S.W.3d 444, 445 (Mo. 2010). The BCP Land Defendants point to Section 802 of the Trust Indenture for the proposition that attorney fees and trustee fees are recoverable under the contract. However, the provision cited by Defendants is the general provision allowing the Trustee to be paid by the District for its ordinary and extraordinary services and counsel fees; that provision does not provide for attorney fees to be awarded in litigation.

21

requirements" and there is no support for the argument that "multiple breaches of contract can act as the foundation for a RICO claim."

This argument misses the mark. In the Amended Complaint, Plaintiff alleges predicate acts of bank fraud and wire fraud. Those offenses are specifically enumerated within the statutory definition of "racketeering activity[.]" *See* 18 U.S.C. § 1961(1) ("'racketeering activity' means . . . (B) any act which is indictable under any of the following provisions of title 18, United States Code: . . . section 1341 (relating to mail fraud), section 1343 (relating to wire fraud)").[15] The BCP Land Defendants do not argue that Plaintiff failed to present sufficient evidence as to any particular element of bank fraud or wire fraud such that Plaintiff has failed to meet its burden to prove the alleged racketeering activity.[16] Therefore, Defendants have not met their burden to show they are entitled to judgment as a matter of law. To the extent the BCP Land Defendants intended to argue that Plaintiff has failed to prove a "pattern" of racketeering activity due to the type and nature of the transactions involved, the Defendants failed to provide any new argument or binding or persuasive authority that commands the Court to reconsider its prior ruling on that issue. *See* Order, Doc. 104, at 13-17.

Third, the BCP Land Defendants argue Plaintiff's fraud-based claims should fail because the false misrepresentations pled in the Amended Complaint are neither false nor representations of fact. Plaintiff argues in response that the BCP Land Defendants failed to disclose the

---

[15] This case is clearly distinguishable from *Annulli v. Panikkar*, cited by Defendants, where the plaintiff alleged "theft by deception" as the predicate act of racketeering activity and the Third Circuit held "theft by deception, like a simple breach of contract or intentional interference with contract, is not a predicate act of racketeering activity enumerated in § 1961(1)." 200 F.3d 189, 199 (3d Cir. 1999). Similarly, in *Stangel v. A-1 Freeman N. Am., Inc.*, cited by Defendants, the plaintiff "listed no actions in their Complaint that constitute racketeering activity under this [Section 1961(1)]." No. CIV.A. 3:01-CV-2198M, 2001 WL 1669387, at *1 (N.D. Tex. Dec. 27, 2001).

[16] Again, compare to *Annulli v. Panikkar*, cited by Defendants, where the Third Circuit held that the plaintiff sufficiently pled the elements of mail and wire fraud to survive a motion for judgment on the pleadings, but later the plaintiff's RICO claim failed because the plaintiff failed to introduce any evidence into the record showing the defendant mailed anything to plaintiff or had phone communications across state lines with plaintiff within the statutory time period. 200 F.3d at 200.

relationship and degree of control between BCP Land and the purchasing entities, which Lopez was required to do based on the relationship of confidence and trust between the parties and BCP Land's superior knowledge of material facts not within the reasonable reach of Plaintiff.

To the extent the BCP Land Defendants argue Plaintiff failed to show the representations at issue were false, the Court has already determined that issue is for the jury to decide.[17] To the extent the BCP Land Defendants argue the representations do not amount to representations of fact, the Court agrees; Lopez's allegedly false representations – i.e. that DPRF funds should be released to Redwine – do not convey a specific fact but, instead, convey Lopez's opinion/expectation that the criteria of Section 406(c) were satisfied and that the funds should be released. *See Watkins v. Gross*, 772 S.W.2d 22, 24 (Mo. Ct. App. 1989) ("Mere statements of opinion, expectations and predictions for the future are insufficient to authorize a recovery for fraudulent misrepresentation."). However, the Court finds Plaintiff has presented sufficient evidence and argument regarding failure to disclose to submit that issue to the jury.[18] Under Missouri law, a party has a duty to disclose "where there is a relationship of trust and confidence between the parties or where one party has superior knowledge or information of a material fact that is not within the fair and reasonable reach of the other party." *White v. Bowman*, 304 S.W.3d 141, 149 (Mo. Ct. App. 2009). Here, Plaintiff argues Lopez had a duty to disclose based on his special relationship of trust and confidence with the Trustee and/or because he had superior knowledge of the relationship between BCP Land and the purchasing entities as

---

[17] See discussion *supra* at Section II.C.1.

[18] The BCP Land Defendants argue Plaintiff failed to plead fraudulent omission and cannot raise that claim now. Under Missouri law, there is no separate tort for "fraudulent nondisclosure"; rather, "in such cases, a party's silence in the face of a legal duty to speak replaces the first element [of fraudulent misrepresentation]: the existence of a representation." *Hess v. Chase Manhattan Bank, USA, N.A.*, 220 S.W.3d 758, 765 (Mo. 2007). Plaintiff argues that "[t]he omissions arise from the same statements alleged in the Amended Complaint – those statements omitted material facts regarding BCP Land's relationship with the purchasers, which Mr. Lopez had a duty to disclose." The Court finds the BCP Land Defendants were sufficiently notified of Plaintiff's failure to disclose argument throughout the pleadings, discovery, and otherwise.

Case 6:14-cv-03025-MDH   Document 299   Filed 03/09/16   Page 23 of 27

compared to the Trustee and the Trustee could not discover such information with reasonable diligence. Whether Plaintiff can satisfy the elements of fraudulent misrepresentation is an issue for the jury.[19]

### III. MOTIONS TO EXCLUDE EXPERT TESTIMONY

Plaintiff and the BCP Land Defendants filed motions to exclude expert testimony under *Daubert* and/or the Federal Rules of Evidence. These motions are both denied and the parties are invited to raise more specific objections to specific testimony through motions in limine.

### A. Standard

The standard to admit expert testimony is stated in Federal Rule of Evidence 702 as amended in 2000 to conform with *Daubert v. Merell Dow Pharmaceuticals, Inc.*, 509 U.S. 479 (1993). The Rule states:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
> **(a)** the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> **(b)** the testimony is based on sufficient facts or data;
> **(c)** the testimony is the product of reliable principles and methods; and
> **(d)** the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. "The proponent of the expert testimony must prove its admissibility by a preponderance of the evidence." *Lauzon v. Senco Products, Inc.*, 270 F.3d 681 (8th Cir. 2001).

### B. Application

#### 1. Plaintiff's Motion to Exclude Expert Testimony of Aaron March

The BCP Land Defendants designated Aaron March, an attorney who concentrates his practice on economic development, zoning, and land use matters, to testify as an expert

---

[19] With regard to both the declaratory judgment/unjust enrichment claims and fraudulent misrepresentation/RICO claims, the Court notes this order finds only that, based on the evidence clearly presented to the Court thus far and the standards relevant to summary judgment, Plaintiff is able to survive summary judgment. The sufficiency of the evidence on each of these claims, of course, will be revisited at trial.

regarding "the terms and conditions under which monies on deposit in the [DPRF] are to be released and returned by the Trustee to the Developer." Plaintiff moves to exclude the reports and testimony of Mr. March on grounds that: (1) he lacks sufficient experience to be qualified to testify as an expert because "[a]lthough Mr. March has experience related to certain aspects of Missouri's economic development laws, he has no experience representing a trustee and has never been involved in a bond transaction in which there has been a default"; and (2) his testimony includes information regarding Section 406(e) of the Trust Indenture and other types of release provisions not included in the Trust Indenture, both of which are not relevant to any material issue in this case.

The Court agrees with Defendants that Plaintiff's objection to Mr. March's expertise goes to the weight of his testimony rather than its admissibility. *See generally Robinson v. GEICO Gen. Ins. Co.*, 447 F.3d 1096, 1100 (8th Cir. 2006) ("Gaps in an expert witness's qualifications or knowledge generally go to the weight of the witness's testimony, not its admissibility."). Plaintiff's objection to the relevancy of certain portions of Mr. March's testimony will be more appropriately addressed either at the pre-trial conference or during trial. Accordingly, Plaintiff's motion to exclude the expert opinion of Mr. March is DENIED at this time.

**2. BCP Land Defendants' Motion to Exclude Expert Testimony of James E. Spiotto**

Plaintiff designated James Spiotto, a licensed attorney and managing director at Stratman Strategic Advisors, LLC, as a rebuttal expert who will testify regarding whether Plaintiff "(a) properly declined to release the moneys on deposit in the [DPRF] to the Developer in 2013 subject to obtaining a court ruling regarding the right to such moneys and (b) [a]cted properly in filing a lawsuit to determine if the moneys released to the Developer in 2012 from the DPRF should be returned to [Plaintiff]." The BCP Land Defendants argue the Court should strike the

report of Mr. Spiotto and exclude his testimony because: (1) his opinions are inadmissible legal conclusions regarding the interpretation of the Trust Indenture and the parties' duties under the Trust Indenture; (2) his opinions will not assist the trier of fact in understanding the evidence or determining any fact in issue because they focus entirely on whether Plaintiff acted appropriately in filing suit and in seeking guidance from the Court, which are not at issue in this case; and (3) his opinions are not reliable because they attempt to insert additional implied terms into Section 406, which is an unambiguous contract.

The Court agrees with Plaintiff that "[t]o the extent the BCP Defendants' expert is permitted to testify regarding the Trustee's duties and the impact of the terms of the Trust Indenture, the Trustee should be able to rebut those opinions with its own expert." *See generally Sancom, Inc. v. Qwest Commc'ns Corp.*, 683 F. Supp. 2d 1043, 1056 (D.S.D. 2010) ("Expert testimony on the meaning of a contract containing technical terms may be admissible. . . . Here, Owens' proposed testimony would identify the relevant terms of Sancom's contracts with Free Conference and Ocean Bay, identify the topics that were not covered by these contracts, and explain how the terms (and the issues not covered in the contracts) affect the issues before the jury. This testimony would be helpful to the finder of fact[.]"). To the extent that Defendants seek to exclude a specific legal conclusion, they may specifically bring that specific part of the report to the Court's attention. *See Cowden v. BNSF Ry. Co.*, 980 F. Supp. 2d 1106, 1118 (E.D. Mo. 2013) ("although expert witnesses may 'embrace' an ultimate issue in their testimony, they may not state legal standards or draw legal conclusions by applying law to the facts"). Plaintiff argues Mr. Spiotto's testimony will assist the jury because it rebuts Mr. March's opinion that the Trustee had no discretion under the Trust Indenture to determine whether to release portions of the DPRF. The Court cannot rule on this issue until the Court hears what Mr. March testifies to

26

at trial.  Finally, as to the additional implied terms, the parties apparently agree that the duty of good faith and fair dealing applies to the Trust Indenture.  To the extent Defendants disagree with Mr. Spiotto's application of that implied term, Defendants may cross-examine Mr. Spiotto and/or present rebuttal testimony.[20]

### III.  DECISION

Based on the foregoing discussion, Plaintiff's Motion for Summary Judgment (Doc. 264) is hereby **DENIED**, BCP Land Defendants' Motions for Summary Judgment (Doc. 258, 260) are hereby **DENIED**, Defendant Redwine's Motion for Summary Judgment (Doc. 262) is **DENIED**, and the parties' motions to exclude expert testimony (Docs. 252, 254) are **DENIED**.


**IT IS SO ORDERED.**

Date:   March 9, 2016                              ___*/s/ Douglas Harpool*_____
                                                                  **DOUGLAS HARPOOL**
                                                                  **UNITED STATES DISTRICT JUDGE**

---

[20] The Court notes that neither expert will not be permitted to testify in a way that is inconsistent the Court's findings and interpretations as stated in this order or as hereafter determined through jury instructions, etc.

27